**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DONALD JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 17-0149-WS-M** |
| | ) | |
| **THE BOARD OF COMMISSIONERS** | ) | |
| **OF THE HOUSING AUTHORITY OF** | ) | |
| **THE CITY OF PRICHARD,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 49). Also pending is defendants' Motion to Strike Affidavit of Felicia A. Jackson (doc. 53). These motions have been briefed and are ripe for disposition.[1]

**I.     Nature of the Case.**

Plaintiff, Donald Jackson, brought this action against his former employer, the Housing Authority of the City of Prichard (the "Housing Authority"), as well as certain related defendants, including the Board of Commissioners of the Housing Authority (the "Board"), Reginald Crenshaw (a Board member), Felicia Snow (the Housing Authority's Executive Director), Charles Pharr (former Executive Director for the Housing Authority), and Greg Harris (counsel for the Housing Authority). Jackson's Second Amended Complaint purported to assert multiple civil-rights and constitutional claims against defendants relating to the Housing Authority's termination of his employment in February 2016.[2] In summary judgment briefing,

---

[1]     Plaintiff has filed a document styled "Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment" (doc. 52). This filing is simply plaintiff's opposition to defendants' summary judgment motion. It is not a separate motion, was not docketed as a motion, and will not be adjudicated as a motion.

[2]     One such cause of action was Count One, a claim for relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* On August 21, 2017, the (Continued)

however, Jackson has markedly narrowed his theory of recovery.  Indeed, plaintiff now indicates in unequivocal terms that his sole claim is that defendants violated his First Amendment right to free speech by retaliating against him, and wrongfully terminating him, for speaking with the Office of Inspector General, all in violation of 42 U.S.C. § 1983.[3]  Accordingly, this Order will not address any other claims enumerated in the Second Amended Complaint (such as the due process / equal protection claims embedded in Count Three), because Jackson has disclaimed any intent to pursue any cause of action other than a § 1983 claim of retaliatory discharge for engaging in protected speech under the First Amendment.[4]

## II.    Relevant Background.[5]

undersigned entered an Order (doc. 33) dismissing Count One as time-barred on its face, such that Jackson failed to state a Title VII claim upon which relief can be granted.

[3]      In the "Introduction" section of his summary judgment memorandum, Jackson writes, "The plaintiff has filed this suit against [defendants] for alleged violation of First Amendment free speech for speaking to the office of Inspector General during the OIG investigation into misuse of federal funds …." (Doc. 52-1, at 1-2.)  Elsewhere in the memorandum, plaintiff reiterates that "Jackson files this suit against the defendants herein alleging a violation of his First amendment [*sic*] by firing him in retaliation for his speaking to the OIG." (*Id.* at 10.)

[4]      *See generally Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned"); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.") (citation and internal quotation marks omitted).  Of course, the Court is well aware of the line of authorities emphasizing that "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004); *see also Branch Banking and Trust Co. v. Trammel*, 2016 WL 7031299, *3 (S.D. Ala. Dec. 1, 2016) ("[s]ummary judgment is not automatically granted by virtue of a non-movant's silence") (citation omitted).  Those cases are distinguishable because what we have here is not mere silence by a non-movant; rather, Jackson has represented to the Court that his only cause of action is a § 1983 claim of retaliation for exercising First Amendment rights in talking to the Office of Inspector General.  In so stating, Jackson has abandoned his other claims.

[5]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. (Continued)

### A. The Biloxi Automobile Accident.

Jackson began working for the Housing Authority in 2007, and served in the capacity of Director of Housing Management beginning in 2008. (Jackson Dep. (doc. 49, Exh. A), at 24.) In that position, Jackson had access to a Housing Authority vehicle, which he was allowed to use for non-business travel. (*Id.* at 59.) On the evening of Friday, June 6, 2014, Jackson was involved in an automobile accident in Biloxi, Mississippi, while driving the company car. (*Id.* at 55.)[6] This incident actually marked Jackson's second accident in a Housing Authority vehicle; indeed, he had previously had a car wreck in a company vehicle for which he received no discipline or reprimand. (*Id.* at 159.)

The following Monday, June 9, 2014, Jackson notified the Housing Authority's then-Executive Director, Charles Pharr, that he had been involved in a "fender bender" in Biloxi. (*Id.* at 71-72.) Jackson gave Pharr the telephone number of the attorney who was representing Jackson in Mississippi proceedings relating to that accident. (*Id.* at 207-08.) It is not clear from the record precisely what Jackson told Pharr about the Biloxi accident during that June 9 conversation. Plaintiff's evidence, however, is that Jackson did <u>not</u> notify Pharr that he had been charged with DUI and possession of marijuana following the June 6 accident. (*Id.* at 207-08.) Based on their discussion and the information conveyed about the incident, Pharr took the

---

*See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment. … Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[6]      The accident resulted in only minor damage to both vehicles. Specifically, the front bumper of Jackson's vehicle was scratched and punctured, and the other vehicle's rear bumper was scraped. (*Id.* at 64-65.) There was no indication of physical injury to the occupants of either vehicle, or anyone else.

following disciplinary action against Jackson: four weeks of suspension without pay, travel restrictions, automobile restrictions, and deferral of pay raise. (*Id.* at 98-99.) Jackson's testimony, which is accepted as true for summary judgment purposes, is that Pharr assured him at the time that "this was not a fireable offense" and that "[i]t could have happened to anyone." (*Id.* at 170.) Nonetheless, Pharr testified that he kept Jackson's case open and instructed him to keep Pharr posted on the progress of his Mississippi case; however, Jackson "never did provide [him] with the information to close the case." (Pharr Dep. (doc. 49, Exh. C), at 27-28.)

### B. The Brookins Termination and OIG Investigation.

In addition to the Biloxi automobile accident, a second storyline is integral to the claims for relief that Jackson is pursuing here. Among Jackson's subordinates at the Housing Authority was a property manager named Sherry Brookins. (Jackson Dep., at 104.) Jackson believed that then-Executive Director Pharr had a personal friendship with Brookins, such that "she was treated more as a favored employee that was given benefits and perks that other managers did not receive." (*Id.* at 143.)[7]

When defendant Felicia Snow became Executive Director of the Housing Authority in January 2015, she ordered a reconciliation of the agency's bank statements. (*Id.* at 109.) In performing that reconciliation, the Housing Authority's finance department discovered certain discrepancies and passed that information on to Jackson. When Jackson investigated, he concluded that Brookins had "stolen money from the agency." (*Id.*) As her supervisor, Jackson recommended that Brookins' employment be terminated. (*Id.*) At a meeting involving Jackson, Snow and the Housing Authority's counsel, defendant Greg Harris, all three of them jointly made the determination that Brookins' employment would be terminated. (*Id.* at 109-10.)[8] Based on that decision, Jackson mailed a letter to Brookins dated February 6, 2015, informing

---

[7] At some point, Brookins was involved in a car wreck in a company-owned vehicle, for which the Housing Authority did not discipline or reprimand her. (*Id.* at 158-59, 163.) During his deposition, Jackson acknowledged that he did not have evidence that Brookins was under the influence of alcohol or that she possessed marijuana in the company vehicle at the time of that accident. (*Id.* at 314.)

[8] Jackson testified that he had previously recommended the termination of another employee, Georgette Nicholson, in 2009 for stealing funds in the same fashion as Brookins. That recommendation had been adopted and the employee had been fired. Jackson handled both the Nicholson situation and the Brookins situation the same way. (*Id.* at 111.)

her that her employment at the Housing Authority had been terminated based on the discovery of discrepancies in several financial reports and her subsequent admission that she had been "taking money orders … and cashing them for [her] personal use." (Jackson Dep., Exh. 15.) The Brookins termination letter was signed by Jackson in his capacity as Director of Housing Management, with a copy sent to Felicia Snow. (*Id.*)

Immediately after the Brookins termination letter was drafted, defendants Harris and Pharr pressured Jackson to change his mind. Harris told Jackson, "you need to think about what you're doing because your situation could have been handled differently," referring to the Biloxi accident, and asked if Brookins could be re-assigned to a position that did not involve handling funds. (Jackson Dep., at 113-14.) Pharr was even more direct, telling Jackson "[y]ou can't terminate her," urging him to investigate the matter further, and inquiring if she could be reassigned elsewhere. (*Id.* at 115-16.) Jackson interpreted these comments as threats, intimidation and harassment. However, Jackson declined to waver from the termination decision. Jackson proceeded with Brookins' dismissal because Brookins had admitted to stealing federal funds, he had previously recommended termination for similarly situated employees, and his job duties included ferreting out and removing employees who were stealing. (*Id.* at 171-72.) Jackson reasoned that if he had "yielded to that kind of pressure, not do the right thing, … [n]ot to do what the agency has done historically when it came to matters of embezzlement and theft of federal funds, that [he] would be on the line with the OIG and HUD for not taking the appropriate action." (*Id.* at 175.) Plaintiff's evidence is that because he stood his ground as to the Brookins termination, several individual defendants began encouraging Snow to take adverse action against Jackson based on the Biloxi accident. (*Id.* at 167.)

In October 2015, eight months after Brookins' firing, the Office of Inspector General ("OIG") visited the Housing Authority to investigate an anonymous complaint. (Doc. 49, Exh. E, ¶ 21.) As part of that investigation, the OIG interviewed Jackson. (*Id.*) During the course of that interview, Jackson spoke with the OIG about "a number of issues," including topics relating to Sherry Brookins. (Jackson Dep., at 222.) Jackson openly and honestly answered all of the OIG's questions, both as to Brookins and as to other unspecified matters. (*Id.* at 225-26.) Jackson confirmed that he spoke with the OIG in his capacity, and pursuant to his official job duties, as the Housing Authority's Director of Housing Management. (*Id.* at 222-23, 225.) Jackson's interview with the OIG was conducted in the Housing Authority's boardroom with

two agents present. (*Id.* at 234-36.) There was no court reporter and the interview was not open to the general public. (*Id.*) All of Jackson's speech to the OIG agents was within the scope of his duties as Director of Housing Management. (*Id.* at 237.) Jackson testified that after he interviewed with the OIG in October 2015, defendants Pharr, Harris and Crenshaw resumed their previous campaign to convince Snow to take adverse action against him. (*Id.* at 220.) For her part, Snow was aware that Jackson had been interviewed by OIG agents, but she did not know any particulars of what was discussed during that interview. (Doc. 49, Exh. E, ¶ 21.)

> ### C.    *The Termination of Jackson's Employment.*

The two disparate storylines outlined above (namely, Jackson's automobile accident in Biloxi in June 2014, and Brookins' termination in February 2015) merge into one as possible causes for the termination of Jackson's employment in February 2016.

Defendant Charles Pharr ceased being Executive Director of the Housing Authority in December 2014, and was succeeded by defendant Felicia Snow in January 2015. (Snow Dep. (doc. 49, Exh. B), at 31.) Snow became aware of Jackson's accident in Biloxi during her transition to Executive Director. (*Id.* at 15.) According to Snow, because Pharr had left the disciplinary matter against Jackson open pending the outcome of Jackson's legal proceedings in Mississippi, she was not comfortable taking further action as to Jackson until additional information about the matter was received. (*Id.* at 38-40.)

On or about April 1, 2015, a lawyer representing Jackson in the Mississippi proceedings sent a letter to Snow. The letter included the following language: "Please be advised that Mr. Jackson's DUI case in Biloxi, Mississippi will be resolved in June 2015. Mr. Jackson's charges will be non-adjudicated and expunged." (Jackson Dep., at 90 & Exh. 6.) On April 21, 2015, Snow followed up with an email to Jackson requesting certain additional information about the Biloxi accident. (Snow Dep., at 63.) Specifically, she requested that he immediately provide "[a]ny and all information related to [his] current driving restrictions," and that by the following day, he furnish both a "[w]ritten statement about the incident" and the "[i]mposed punishment/restrictions by [the Housing Authority]." (*Id.* at Exh. 1.) Jackson submitted such a written statement to Snow, in which he described the accident as a "fender bender" that occurred when the car in front of him abruptly braked, such that the other vehicle's "[r]ear right side passenger bumper encountered the front passenger bumper of the [Housing Authority] vehicle." (Jackson Dep., at 127-28.) Jackson's written statement of April 2015 omitted any mention of

pending DUI or marijuana charges as a result of the accident. (*Id.* at 103-04.) Jackson's statement to Snow also failed to identify any driving restrictions, including the interlock device that he was required to place on his personal vehicle. (Doc. 49, Exh. E, ¶¶ 6, 8, 9.)

In late 2015, Jackson furnished to Snow a copy of a court order from Biloxi Municipal Court dated September 10, 2015. (Doc. 49, Exh. E, ¶ 10.) That order, styled "Order to Expunge," directed that all records relating to Jackson's "arrest, trial and dismissal on the charges of … DUI … should be immediately expunged," on the grounds that such charges had been "nolle prossed, dismissed, passed to the inactive files or otherwise not prosecuted." (Jackson Dep., Exh. 11.) According to the Order, Jackson "shall not hereafter be found under any provisions of any law, to be guilty of perjury or otherwise giving a false statement by reason of failure to acknowledge such arrest, trial, and disposition of said charges to any inquiry made of said defendant for any purpose." (*Id.*)[9]

In December 2015, Snow received a copy of the Biloxi Police Department Offense / Incident Report dated June 6, 2014. (Snow Dep., at 65; doc. 49, Exh. E, ¶ 11.) The circumstances under which this Report was furnished to Snow (and the reasons for the belated timing of such disclosure) are unclear; however, the record reflects that Jackson's attorney from the Mississippi proceedings was the source of the document. (Exh. E, ¶ 11.) Prior to December 2015, Snow was unaware of the existence or contents of that Offense/Incident Report. (*Id.*) The Report contained troubling details about Jackson's condition and possessions at the time of the "fender bender," including the following: (i) after the accident, Biloxi police officers observed Jackson to have slurred speech, glassy and bloodshot eyes, and unstable balance; (ii) Jackson failed a field sobriety test and was arrested for DUI; (iii) the ensuing inventory search of the vehicle (which, again, was owned by the Housing Authority) revealed the presence of an open bottle of vodka and drug paraphernalia containing marijuana residue; (iv) Jackson refused to submit to a breathalyzer test; and (v) Jackson was charged with driving under the influence and possession of drug paraphernalia. (Jackson Dep., at Exh. 5.) Jackson had disclosed none of

---

[9]     Nothing in that Order to Expunge would prohibit or restrict Jackson's employer from taking adverse employment action against him on the basis of its understanding of the events that took place in Biloxi on June 6, 2014. Plaintiff does not maintain otherwise.

these details to Snow when she previously requested information about the Biloxi incident. (Doc. 49, Exh. E, ¶ 11.)

Upon learning these details, Snow became concerned that entrusting a Housing Authority executive with a company vehicle in light of these events "would be a problem as it relates to liability and also future reprimands and disciplinary actions on staff." (Snow Dep., at 66.)[10]  On that basis, according to Snow's testimony, she decided in December 2015 to terminate Jackson's employment at the Housing Authority. (*Id.* at 31.)  Snow testified that she decided to terminate Jackson's employment "[f]or driving under the influence in a housing authority vehicle in Biloxi with … various counts of marijuana charges." (*Id.* at 67.)  Snow was the only decision maker for Jackson's termination. (Doc. 49, Exh. E, ¶ 18.)  Although she made the decision in December 2015, it was not implemented until February 2016 because Jackson had been on sick leave during the interim. (*Id.*, ¶ 13.)

On February 12, 2016, Snow hand-delivered a termination letter to Jackson. (*Id.*, ¶ 12.) That letter notified Jackson that his employment with the Housing Authority was terminated, effective immediately. (Snow Dep., Exh. 4.)  The February 12 letter identified multiple sections of the Housing Authority's Personnel Policy that were considered in the termination decision, including provisions addressing (i) abuse or misuse of Housing Authority property or vehicles; (ii) violations of departmental rules; (iii) consumption of alcoholic beverages during off-duty hours in a manner that adversely affects work performance; (iv) acts outside of duty hours that are incompatible with public service; (v) acts that endanger the safety or health of others, or that discredit the Housing Authority; and (vi) use of Housing Authority property without proper authority. (*Id.*)

## III.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the

---

[10]    Snow elaborated that it was an obvious concern for a Housing Authority employee driving a Housing Authority vehicle to be "endangering the health and safety of others," from the standpoint of both potential liability to the Housing Authority and "the bad precedential effect that would be set for similar actions if appropriate action was not taken with Jackson." (Doc. 49, Exh. E, at ¶ 14.)

district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV. Analysis.

As noted above, notwithstanding the multiple causes of action pleaded in the Second Amended Complaint, the sole claim that Jackson now pursues against defendants is one for First Amendment retaliation. Both Jackson and his counsel confirmed during the Jackson deposition that his claims are asserted exclusively under the First Amendment.[11] Moreover, Jackson repeatedly, unambiguously testified that the nature of his First Amendment claims under § 1983 is that defendants violated his rights by terminating his employment in retaliation for having given true and honest testimony to the OIG.[12] In his summary judgment brief, plaintiff

---

[11]     In response to defense counsel's comment as to the form and nature of Jackson's claims that "it's really all part of the First Amendment," plaintiff's counsel stated, "It sure is." (Jackson Dep., at 282.) Defense counsel followed up by asking, "[W]hat I'm trying to figure out is other than the First Amendment claims, is there some other violation of your constitutional rights?" (*Id.* at 286.) Both Jackson and his lawyer answered in the negative. (*Id.*) When Jackson identified his claims and defense counsel asked, "those all come back to being First Amendment?" Jackson answered, "Okay. Yes." (*Id.* at 287.)

[12]     *See* Jackson Dep., at 219 ("my First Amendment rights were violated because I was actually speaking to the OIG"), 233 ("when we're talking about First Amendment rights, I'm saying that my First Amendment rights were violated as a result of me having spoken to the OIG and giving true and honest testimony"), 240 (in response to question as to whether he says (Continued)

succinctly summarized his theory as follows: "In the case before the court, Jackson was fired in retaliation for giving truthful testimony during the OIG's investigation regarding corruption and misuse of federal funds." (Doc. 52-1, at 9.) Plaintiff's position could not be clearer that, in his view, "Jackson was fired for speaking to the OIG," thereby violating his First Amendment rights. (*Id.* at 10.) Jackson has abandoned all other claims and theories of liability. Therefore, it is to that claim alone that the summary judgment analysis will be directed.

The legal test for First Amendment retaliation claims by public employees such as Jackson for disciplinary action by a government employer is well-settled. In particular, the Eleventh Circuit has adopted a four-stage analysis "[i]n cases where the state denies discharging the employee because of speech." *Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1168 (11th Cir. 2013) (citation omitted). "First, we consider whether Plaintiff's speech was made as a citizen and whether it implicated a matter of public concern." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015) (citations and internal quotation marks omitted); *see also Carter*, 731 F.3d at 1168. If so, then the court weighs the plaintiff's First Amendment interests against the government employer's interest "in regulating his speech to promote the efficiency of the public services it performs through its employees." *Moss*, 782 F.3d at 618 (citations and internal quotation marks omitted); *see also Carter*, 731 F.3d at 1168. Both of these prongs constitute questions of law decided by the court to determine whether the plaintiff's speech is subject to First Amendment protection. *See Moss*, 782 F.3d at 618. If the court concludes that the plaintiff's speech is so protected, then "the third stage of the analysis requires Plaintiff to show that it was a substantial motivating factor in his termination." *Id.*; *see also Carter*, 731 F.3d at 1168. If so, then the fourth stage is for the government employer to show that it would have terminated the plaintiff's employment even in the absence of such protected speech. *Moss*, 782 F.3d at 618; *see also Carter*, 731 F.3d at 1168. Because the third and fourth stages addressing "the causal link between Plaintiff's speech and his termination[] are questions of fact,

_____

his First Amendment rights were violated in any other way, "I'm not sure I know exactly"), 245 (agreeing with defense counsel that his claim is that he was being punished for exercising his right to free speech when he "opened [his] mouth to speak about Sherry Brookins to the defendants and to the OIG," and that "[o]ther than with the OIG," he was not making any other or different free speech claims).

a jury resolves them unless the evidence is undisputed." *Moss*, 782 F.3d at 618. Defendants' Motion for Summary Judgment focuses on the first and third prongs of the four-stage analysis.

### A.    First Stage: Speech as a Citizen on a Matter of Public Concern.

The first stage of the analysis turns on whether the plaintiff's speech was made as a "citizen" and whether it implicated a matter of "public concern." *Moss*, 782 F.3d at 617. The Supreme Court has explained that "employee speech is largely unprotected if it is part of what the employee is paid to do … or if it involved a matter of only private concern." *Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S.Ct. 2448, 2471 (2018). "On the other hand, when a public employee speaks as a citizen on a matter of public concern, the employee's speech is protected unless" the *Pickering* balancing test shows that the state's interest outweighs the employee's interest. *Id.* Thus, a plaintiff cannot satisfy this first stage without a showing that both (i) the speech was made as a citizen, rather than as an employee, and (ii) the speech involved a matter of public concern, rather than private concern. *See, e.g., Alves v. Board of Regents of the University System of Georgia*, 804 F.3d 1149, 1160 (11th Cir. 2015) ("For her speech to be constitutionally protected, an employee must have spoken (1) as a citizen and (2) on a matter of public concern."). Defendants argue that neither prerequisite for First Amendment protection is satisfied here.

To resolve the legal question of whether a plaintiff's speech is made as a citizen or as an employee, "[t]he central inquiry is whether the speech at issue owes its existence to the employee's professional responsibilities." *Moss*, 782 F.3d at 618 (citation and internal quotation marks omitted); *see also Alves*, 804 F.3d at 1160 ("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens") (citation omitted). "Factors such as the employee's job description, whether the speech occurred at the workplace, and whether the speech concerns the subject matter of the employee's job may be relevant, but are not dispositive." *Moss*, 782 F.3d at 618 (citation omitted). Indeed, for an employee to be speaking as an employee (rather than a citizen), the speech must be "made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." *Alves*, 804 F.3d at 1162. "Whether a public employee spoke as a citizen is a question of law for the court to resolve." *Carollo v. Boria*, 833 F.3d 1322, 1329 (11th Cir. 2016) (citation and internal marks omitted).

When Jackson spoke with the OIG investigators in October 2015, he did so as an employee, not as a citizen. How do we know? For starters, Jackson repeatedly acknowledged as much in his deposition. Specifically, Jackson admitted that all of his speech to the OIG was within his duties as Director of Housing Management, that it was part of his job to tell the OIG these things, and that when he was speaking to OIG, he did so in his capacity as Director of Housing Management and as part of his job duties. (Jackson Dep., at 222, 223, 237, 246.)[13] Moreover, Jackson was interviewed by OIG agents in the workplace (*i.e.*, the Housing Authority's boardroom) about matters that Jackson had observed or experienced in the workplace as Director of Housing Management. All information before this Court is that Jackson spoke to the OIG in accordance with his job duties as Director of Housing Management about the subject matter of his job, in a workplace interview setting. These facts and circumstances favor a conclusion that, as a matter of law, Jackson's speech to the OIG was made as an employee, not as a citizen, because such speech was in accordance with, and in furtherance of, the ordinary responsibilities of Jackson's job. As such, this speech was outside the scope of First Amendment protection. *See generally Alves*, 804 F.3d at 1164-65 (concluding that plaintiffs spoke as employees, not as citizens, where they raised concerns about director of counseling's poor leadership and mismanagement "in furtherance of their ability to fulfill their duties with the goal of correcting Dr. Lee-Barber's alleged mismanagement, which interfered with Appellants' ability to perform"); *Phillips v. City of Dawsonville*, 499 F.3d 1239, 1242-43 (11th Cir. 2007) ("Plaintiff's appointed position as City Clerk gave her some control over and accountability for City funds …. We conclude that the reporting here of the improper use of city resources and of behavior that might well result in expense and even liability for the City was speech pursuant to Plaintiff's official duties.").

---

[13]    In his summary judgment brief, plaintiff takes defendants to task for failing to "submit any evidence out lining [*sic*] the duties require [*sic*] of Jackson's position." (Doc. 52-1, at 12.) Under the circumstances, however, it was unnecessary for defendants to present a formal job description or other comprehensive exposition of the job duties of the Director of Housing Management. After all, Jackson repeatedly, unequivocally testified that his interview with the OIG agents was given as part of his official job duties; therefore, we know that the ordinary responsibilities of Director of Housing Management included cooperating with OIG inquiries and submitting to OIG interviews.

Jackson's argument that he spoke as a citizen rests entirely on application of the Supreme Court's decision in *Lane v. Franks*, 134 S.Ct. 2369 (2014). Lane terminated the employment of one of his subordinates (Schmitz) in the course of his ordinary job duties. When Schmitz was later indicted for fraud and theft of federal funds, Lane was subpoenaed to testify at her trial about events leading to the termination decision, which he did. Lane was subsequently fired, after which he filed a civil suit alleging that the employer "had violated the First Amendment by firing him in retaliation for his testimony against Schmitz." *Id.* at 2376. The employer argued that Lane's speech was as an employee, not as a citizen, because he was acting in accordance with his official duties when he investigated and terminated Schultz. The Supreme Court rejected this contention, concluding that Lane had spoken as a citizen. In so doing, the *Lane* Court reasoned that "[s]worn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth. … That independent obligation renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee." *Id.* at 2379. In opposing defendants' Rule 56 Motion, Jackson would seek to align this case with the facts and rationale of *Lane*.[14]

Plaintiff's reliance on *Lane* cannot withstand scrutiny. After all, the Eleventh Circuit has explained that "[t]he Court's holding in *Lane* is a narrow one," one that "relied specifically on the nature of compelled testimony." *Alves*, 804 F.3d at 1163. This insight underscores the

---

[14]    Perhaps the clearest exposition of Jackson's argument is as follows: "The Court held that because lane [*sic*] did not testify to fulfill a work responsibility he spoke as a citizen, not as an employee. Clearly, Jackson also did not testify to fulfill a work responsibility he spoke as a citizen, not as an employee." (Doc. 52-1, at 12.) Plaintiff's characterization of Jackson's "work responsibilities" cannot be reconciled with Jackson's own deposition testimony. In his deposition, Jackson acknowledged that he spoke with the OIG as the Director of Housing Management, within the scope of his duties in that position. (Jackson Dep., at 222-23.) Jackson answered affirmatively when asked if his speech to the OIG was given in his capacity as Director of Housing Management. (*Id.* at 225.) He answered affirmatively when asked if he was discharging his official duties by giving that speech. (*Id.*) He answered affirmatively when asked if "all of that speech was within [his] duties as the director of housing management." (*Id.* at 237.) And he answered affirmatively when asked, "So it's part of your job to tell them those things, correct?" (*Id.*) Given the unambiguous record evidence on this point, the Court cannot accept plaintiff's counsel's unsupported representation that "Jackson also did not testify to fulfill a work responsibility," because that statement is directly contradicted by plaintiff's own clear deposition testimony in this matter.

critical infirmity in plaintiff's argument. Unlike the plaintiff in *Lane*, Jackson did not provide sworn testimony in judicial proceedings. There is no evidence was that his participation was compelled via subpoena. He did not appear in court. No court reporter was present. There is no indication that OIG agents placed him under oath. Instead, the uncontroverted record evidence is that OIG agents simply interviewed Jackson about Sherry Brookins and other matters (apparently, Jackson's own private dissatisfactions and grievances against the Housing Authority) in a conference room at the Housing Authority. Unlike *Lane*, the facts of this case have nothing to do with compelled testimony. Unlike *Lane*, Jackson spoke with the OIG agents strictly in his capacity as Director of Housing Management, in fulfillment of the duties of that position. Unlike *Lane*, Jackson was not laboring under an independent obligation "to the court and society at large, to tell the truth." For all of these reasons, the narrow holding of *Lane v. Franks* is inapplicable here, and cannot support classification of Jackson's speech as citizen speech for purposes of a First Amendment retaliation analysis. Rather, all evidence in the summary judgment record is that Jackson's speech to the OIG agents was made in accordance with or in furtherance of the ordinary responsibilities of his employment, thereby constituting "employee" speech beyond the purview of First Amendment protection.

Even if Jackson's speech were made as a citizen rather than employee, it would remain excluded from First Amendment protection because the summary judgment record does not show that it implicated a matter of public concern. "For an employee's speech to rise to the level of public concern, it must relate to a matter of political, social, or other concern to the community." *Watkins v. Bowden*, 105 F.3d 1344, 1353 (11th Cir. 1997). "[T]he relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is whether the purpose of the plaintiff's speech was to raise issues of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1344 (11th Cir. 2006) (citations and internal marks omitted). To determine whether the purpose of the speech was to raise issues of public concern or to further the employee's own private interest, courts "consider the content, form, and context of the employee's statements, the employee's attempts to make the concerns public, and the employee's motivation in speaking." *Id.* Because "an employee's speech will rarely be entirely private or entirely public, … [w]e ask whether the main thrust of the speech in question is essentially public in nature or private. … If the main thrust of a public employee's speech is on a matter of public concern, the speech is protected." *Alves*, 804 F.3d at 1162 (citations omitted).

Defendants argue that, on this record, no reasonable finder of fact could conclude that Jackson's speech to the OIG agents implicated a matter of public concern. Jackson's deposition testimony was exceedingly vague as to the contents of his speech to the OIG. His summary of the OIG interview was, "It was more than Sherry Brookins when I met with the OIG. There was a number of issues that came up." (Jackson Dep., at 222.) Later in his deposition, Jackson elaborated that the OIG asked questions "[a]bout the agency. Sherry Brookins was only one aspect of what they were questioning me about." (*Id.* at 226.) The summary judgment record thus reflects only that Jackson spoke to the OIG agents about Sherry Brookins (a former employee whose employment at the Housing Authority had been terminated eight months earlier) and "about the agency." No reasonable finder of fact could conclude on this evidence that the purpose of Jackson's speech to the OIG was to raise issues of public concern. There simply are no record facts that might support a finding. On summary judgment, plaintiff has not meaningfully addressed defendants' argument that the "matter of public concern" element is not satisfied.[15] Accordingly, even if genuine issues of material fact remained as to whether Jackson was speaking as an employee or a citizen, his First Amendment claim would nonetheless fail as a matter of law for want of evidence that his speech related to a matter of public concern.

## B. Third Stage: Speech as Substantial Motivating Factor in Termination.

Even if Jackson had made a sufficient showing of genuine issues of material fact as to whether his speech to the OIG was made as an employee on a matter of public concern, so as to implicate First Amendment protection, defendants would remain entitled to summary judgment. As noted, "the third stage of the analysis requires Plaintiff to show that [the protected speech]

---

[15] At best, plaintiff responds in his summary judgment brief by arguing that he gave testimony to the OIG "investigating a complaint file [*sic*] against the Prichard Housing Authority regarding corruption in a public program and misuse of federal funds. … As a result, he was speaking as a citizen on a matter of public concern." (Doc. 52-1, at 14.) The trouble is that plaintiff does not point to any record evidence that would support a finding that his OIG interview was focused on "corruption in a public program and misuse of federal funds." On summary judgment, the Court cannot accept plaintiff's counsel's unsupported *ipse dixit* from a brief. *See, e.g., Ely v. Mobile Housing Bd.*, 13 F. Supp.3d 1216, 1218 n.1 (S.D. Ala. 2014) ("This Court cannot and will not simply take counsel's word for it that particular unsupported facts are correct."); *Kirksey v. Schindler Elevator Corp.*, 2016 WL 3189242, *8 n.17 (S.D. Ala. June 7, 2016) ("Of course, a court on summary judgment cannot accept counsel's *ipse dixit* for a particular fact.").

was a substantial motivating factor in his termination." *Moss*, 782 F.3d at 618.  For purposes of this analysis, "we examine the record as a whole to ascertain whether [plaintiff] presented sufficient evidence for a reasonable jury to conclude that his protected speech was a 'substantial' motivating factor in the decision to terminate him." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11ᵗʰ Cir. 2000) (citation omitted).

The most glaring causation problem confronting Jackson is that uncontroverted record evidence confirms that the person who terminated his employment at the Housing Authority was unaware of his protected speech.  It is, of course, black-letter law in all manner of employment retaliation claims that "[t]o establish a causal connection, a plaintiff must show that the relevant decisionmaker was aware of the protected conduct." *Kidd v. Mando American Corp.*, 731 F.3d 1196, 1211 (11ᵗʰ Cir. 2013) (citation and internal question marks omitted); *see also Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11ᵗʰ Cir. 2017) ("Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action.") (citation omitted); *Willis v. Publix Super Markets, Inc.*, 619 Fed.Appx. 960, 962 (11ᵗʰ Cir. Sept. 25, 2015) (affirming dismissal of retaliation claims where plaintiff "failed to establish a causal connection between the protected activity and his termination because he did not show that any of the decision-makers were aware of the protected conduct at the time of his termination").  As a matter of common sense, "[a] decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11ᵗʰ Cir. 2000).  Stated differently, a plaintiff's protected speech under the First Amendment cannot have been a substantial motivating factor in the decision to terminate him if the decision maker who fired him did not know of the protected speech.

Here, the summary judgment record unequivocally shows that Felicia Snow, who was the Executive Director of the Housing Authority at the time, was the sole decision maker involved in the termination of Jackson's employment.  (Doc. 49, Exh. E, ¶ 18.)  The record further shows that, while Snow was aware that the OIG had interviewed Jackson, she did not know "what was discussed during that interview." (*Id.*, ¶ 21.)  Plaintiff has offered no facts or argument that might give rise to genuine issues of fact on this point.  As such, it is uncontroverted that Snow had no knowledge, and no reason to know, that Jackson had engaged in protected speech with OIG officials when she made the decision to terminate his employment at the Housing Authority.

For that reason, it is common sense that any protected speech by Jackson to the OIG agents could not have been a substantial motivating factor in Snow's decision to fire him. Not only has plaintiff failed to present evidence raising genuine issues of material fact as to causation and decision maker knowledge of protected speech, but also Jackson has failed to address this argument in any meaningful way in his summary judgment submissions.

The Court recognizes, of course, that the question of causation in a First Amendment retaliation case is typically one of fact for the jury to decide. But where, as here, the undisputed evidence shows that no reasonable jury could find the requisite causal relationship, summary judgment is appropriate. *See Moss*, 782 F.3d at 618 (because causal link between plaintiff's speech and termination is a question of fact, jury must resolve it "unless the evidence is undisputed"); *see also VanDeWalle v. Leon County Florida*, 661 Fed.Appx. 581, 587 (11th Cir. Sept. 9, 2016) (summary judgment for defendant on First Amendment retaliation claim is appropriate where, "even assuming [plaintiff] engaged in speech protected by the First Amendment, no reasonable jury could conclude that the speech and her termination were causally related"). Such is the case on this record; therefore, the Court concludes that defendants would be entitled to summary judgment on Jackson's First Amendment retaliation claim for failure to establish the third prong (the "substantial motivating factor" prong), even assuming that Jackson's speech implicated the First Amendment as a threshold matter.

## V.  Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendants' Motion to Strike the Affidavit of Felicia A. Jackson (doc. 53) is **moot** because the Court need not reach it to decide the pending summary judgment motion in its entirety;

2. Defendants' Motion for Summary Judgment (doc. 49) is **granted**, because plaintiff's sole claim is one of First Amendment retaliation, but the record unambiguously shows that (i) the purportedly protected speech was made as an employee and did not involve a matter of public concern, such that it was outside First Amendment protection; and (ii) no genuine issue of material fact concerning causation exists because undisputed record evidence shows that the decision maker who terminated Jackson's employment was unaware of the purportedly protected speech at the time the decision was made; and

3.    There being no other remaining claims or causes of action pursued by plaintiff, this action is **dismissed with prejudice**; and

4.    A separate Judgment will enter.

DONE and ORDERED this 2nd day of August, 2018.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE